UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

LUCY ROBERTS, on behalf of herself
and all others similarly situated,

Plaintiff,

v.                    4:12-cv-200

WELLS FARGO BANK, N.A.; WELLS
FARGO INSURANCE, INC.;
AMERICAN SECURITIES
INSURANCE COMPANY; and
ASSURANT, INC.,

Defendants.

## ORDER

### I. INTRODUCTION

Before the Court are the following motions: (1) Wells Fargo Bank, N.A. ("Wells Fargo")[1] and Wells Fargo Insurance's ("WFI") motion to dismiss for failure to state a claim, ECF No. 34; (2) Wells Fargo and WFI's motion to dismiss for lack of subject matter jurisdiction, ECF No. 35; (3) American Securities Insurance Company's ("ASIC") motion to dismiss for failure to state a claim and lack of subject matter jurisdiction, ECF No. 39; and (4) Assurant Inc.'s motion to dismiss for failure to state a claim and lack of subject matter jurisdiction. ECF No. 36.

This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005 because the amount in controversy exceeds $5 million, and minimal diversity exists. *See* 28 U.S.C. § 1332(d)(2).

Lucy Roberts ("Roberts"), on behalf of herself and a purported class of borrowers, asserts various state law claims challenging "a pattern of unlawful and unconscionable profiteering and self-dealing" by Defendants that resulted in her paying "excessively high premiums for insurance forcibly placed by Wells Fargo." ECF No. 1 at 1-2. Wells Fargo, WFI, and ASIC primarily challenge Roberts's right to a lower rate. *See, e.g.*, ECF No. 34 at 2. Assurant's central contention is that it "has no connection to the events and allegations of the Complaint" beyond being the corporate parent of ASIC and that Roberts therefore lacks standing to assert claims against it. ECF No. 36 at 1.

The Court agrees that Roberts has no standing to assert claims against Assurant. Assurant's motion to dismiss for lack of subject matter jurisdiction is ***GRANTED***. Roberts's right to a lower rate, however, involves unsettled questions of Georgia law surrounding the applicability of the filed rate doctrine in the insurance rate setting context. In lieu of what would amount to informed speculation, the Court elects to certify a question to the Supreme Court of Georgia. The Court therefore ***STAYS*** this action until such time as the Supreme Court of Georgia answers, or declines to answer, the certified question.

### II. BACKGROUND

Because this case is before the Court on a motion to dismiss, this Order relates the facts in the light most favorable to Roberts,

---

[1] The Court uses "Wells Fargo" to refer *only* to Wells Fargo, N.A., whereas for Roberts "Wells Fargo Bank and Wells Fargo Insurance *may* be collectively referred to as 'Wells Fargo.'" ECF No. 1 at 3 (emphasis added).

the non-moving party. *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1271 n.4 (11th Cir. 2012). First, this section describes generally the "force-placed" insurance system allegedly operated by Defendants. Second, it relates the facts specific to Roberts's Wells Fargo mortgage and the force-placed insurance Wells Fargo charged Roberts for. Third, this section outlines the counts in Roberts's complaint and the defenses asserted in response.

### A. Force-Placed Insurance

Wells Fargo, a large national bank, offers a bevy of financial services, including residential mortgages. ECF No. 1 at 5. Every borrower whose mortgage is owned or serviced by Wells Fargo must maintain homeowner's insurance on the mortgaged property. *Id.* If that insurance lapses, "Wells Fargo can purchase insurance for the home, 'force-place' it, and charge the borrower the full cost of the premium." *Id.* at 6.

According to Roberts, however, those "premiums are not the actual amount that Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo." *Id.* Roberts further alleges that Wells Fargo, in bad faith, "entered into an agreement with Assurant to provide force-placed insurance policies" at "unreasonably high rates." *Id.* Under this agreement, Assurant pays Wells Fargo kickbacks, commissions, and provides free services, all of which are included in the premiums charged consumers like Roberts. *Id.* at 7. Wells Fargo, then, "has an incentive to seek higher cost force-placed policies that offer bigger kickbacks." *Id.*

As part of this agreement, Assurant also provides a portfolio tracking service that monitors all of Wells Fargo's mortgages to ensure they have valid insurance. *Id.* at 8. The cost of the service includes "tracking for all of Wells Fargo's loans, not just those charged for force-placed insurance." *Id.* That cost is then "passed on to homeowners in the form of excessive premiums" for force-placed insurance. *Id.*

In the event a borrower's insurance lapses, the tracking agreement provides for Assurant to automatically place insurance at a price predetermined by the agreement. *Id.* at 8-9. If the borrower cannot pay the premium out of pocket, the premium is "added to the mortgage's principal balance" and "charge[d to] the customer's escrow account." *Id.* at 10. The cost of the insurance "bears no relation to each homeowner's individual home." *Id.* at 10.

Roberts also claims the defendants "retroactively force-place exorbitant insurance on homeowners for the periods of time in the past where coverage ha[s] lapsed" even though no claims are made during that period and "the homeowner has since secured standard insurance." *Id.* Such actions—along with including kickbacks and the costs of Assurant's tracking service in the price of force-placed insurance—says Roberts, "represent bad faith and unconscionable practices" that are "prohibited by Georgia law." *Id.* at 11.

### B. Roberts's Mortgage

On December 12, 1997, Roberts closed on a house whose mortgage SouthTrust Mortgage Corporation originally held. ECF 1-2 at 1. Wells Fargo later acquired SouthTrust and became the successor in interest to Roberts's mortgage. ECF No. 1 at 12. Wells Fargo also services the mortgage. *Id.*

For many years, Roberts maintained home owner's and flood insurance as required by the mortgage. *Id.* at 13. In January 2011, however, Roberts allowed the homeowner's insurance to lapse. *Id.* Wells Fargo, "without seeking competitive bids on the open market . . . exercised its discretion . . . and contracted with Assurant" to provide force-placed homeowner's insurance on Roberts's property. *Id.*

Roberts received notice of the force-placed policy via a letter sent February 28, 2011. *Id.* In that letter, Wells Fargo informed Roberts that the policy, purchased from ASIC,[2] would be "backdated to January 28, 2011." *Id.*

On April 12, 2011, Wells Fargo notified Roberts it had purchased a force-placed homeowner's policy from ASIC effective from January 28, 2011, to January 28, 2012. *Id.* Wells Fargo charged the cost of that policy, $989, to Roberts's escrow account. *Id.*

Wells Fargo also force-placed flood insurance on Roberts's property on multiple occasions, each time "[w]ithout attempting to re-instate her old policy and without shopping the open market for a reasonable premium." *Id.* at 14. In April 2011, Wells Fargo force-placed a flood insurance policy effective from January 15, 2010, to January 15, 2011, charging Roberts $1,121. *Id.* At the same time, Wells Fargo force placed another flood policy, to run from January 15, 2011, again charging Roberts $1,121. *Id.* Twice more—in September 2011, and May 2012—Wells Fargo force-placed flood insurance, once charging $450, another time charging $459. *Id.* After Wells Fargo added the force-placed policies, both flood and homeowner's insurance, to Roberts's mortgage, the monthly payment "was 267% higher than the mortgage payment prior to the force-placed policies." *Id.*

### C. Roberts's Complaint and Defendants' Responses

Roberts initiated this litigation on July 24, 2012. *Id.* at 1. In her complaint, Roberts includes counts of (1) breach of contract against Wells Fargo;[3] (2) breach of fiduciary duty against Wells Fargo; (3) unjust enrichment against all defendants; and (4) aiding and abetting a breach of fiduciary duty against ASIC and Assurant.[4] *Id.* at 18-23.

---

[2] The Court is painfully aware of the discrepancy between this sentence, which states ASIC provided the policy, and the preceding paragraph, which states Assurant provided the policy. Whether this apparent contradiction is the result of Roberts lumping Assurant and ASIC together for purposes of easy reference or not, *see id.* at 3, the Court must nevertheless relate the facts as Roberts alleges them.

[3] As with Roberts's earlier ambiguous references to ASIC and Assurant, it is unclear whether this count, and the breach of fiduciary duty count, refer to Wells Fargo, or Wells Fargo and WFI together.

[4] To complicate matters yet further, Roberts here refers to Assurant and ASIC individually, when previously she used "Assurant" to refer to both ASIC and Assurant.

3

All four defendants responded by filing motions to dismiss. *See* ECF Nos. 34; 36; 39. In their motion pursuant to Federal Rule of Civil Procedure 12(b)(6), Wells Fargo and WFI assert four reasons Roberts fails to state a claim: (1) The rates Roberts paid for the force-placed insurance were filed with the Georgia Insurance Commissioner ("Commissioner") and thus the filed rate doctrine precludes Roberts's claims, ECF No. 34 at 2; (2) the primary jurisdiction doctrine required Roberts to exhaust administrative remedies before the Commissioner prior to filing suit, something she did not do, *id.*; (3) Roberts failed to plead essential elements of her claims, *id.*; and (4) the National Bank Act preempts Roberts's state law claims. *Id.* at 2-3.

Wells Fargo and WFI also filed a motion to dismiss for lack of subject matter jurisdiction. ECF No. 35; FED. R. CIV. P. 12(b)(1). That motion argues application of the filed rate doctrine prevents Roberts from sustaining a cognizable injury sufficient for standing. *See* ECF No. 35 at 1.

ASIC also filed a 12(b)(1) motion arguing a lack of standing based on the filed rate doctrine. ECF No. 39 at 1-2. In the same motion, ASIC alleges Roberts failed to state a claim because she did not plead the required elements of the unjust enrichment and aiding and abetting claims against ASIC. *Id.* at 2.

Like Wells Fargo, WFI, and ASIC, Assurant filed a 12(b)(1) motion asserting lack of standing because of the filed rate doctrine. ECF No. 36 at 2. Assurant alone, however, argues that, in addition to a lack of injury, Roberts cannot demonstrate the causation and redressability elements of standing because Assurant is not an insurance company; did not issue the policies at issue in this case; and "has no connection to the events and allegations of the Complaint." *Id.* at 1. Assurant, like the other three defendants, also argues for a 12(b)(6) dismissal for failure to plead the essential elements of the claims. *Id.* at 2.

### III. ANALYSIS

This Order proceeds as follows: First, the Order sets forth the appropriate standard of review for motions to dismiss. Second, it evaluates Assurant's argument that Roberts lacks standing because she cannot demonstrate causation and redressability. Third, the Order concludes by discussing the filed rate doctrine and why the question of its applicability here is best left to the Supreme Court of Georgia.

#### A. Standard of Review

The defendants have filed several motions to dismiss, under both Rule 12(b)(1) and 12(b)(6). In deciding motions under 12(b)(6), courts must accept as true all factual allegations in a complaint and construe them in the light most favorable to the plaintiff. *Lanfear*, 679 F.3d at 1271 n.4; *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011). But courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Claims, moreover, must be facially plausible. That is, they must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial

plausibility "is not akin to a probability standard requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Rule 12(b)(1) motions come in two flavors. They "can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). Facial attacks on subject matter jurisdiction are subject to the same standard of review as 12(b)(6) motions. *Gupta v. McGahey*, No. 11-14240, 2013 WL 562879, at *1 (11th Cir. Feb. 15, 2013) (citing *Carmichael*, 572 F.3d at 1279). Attacks on the factual underpinnings of jurisdiction, on the other hand, may allow a court to "consider extrinsic evidence such as deposition testimony and affidavits." *Carmichael*, 572 F.3d at 1279. And with factual attacks, "the burden is on the plaintiff to prove that jurisdiction exists." *Gibbs v. United States*, 865 F. Supp. 2d 1127, 1135 (S.D. Fla. 2012) (quoting *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002)).

Wells Fargo, WFI's, and ASIC's 12(b)(1) motions are facial attacks. They are "based [solely] on the allegations in the complaint," and therefore will be evaluated according to the 12(b)(6) standard outlined above. *Id.*

Assurant's 12(b)(1) motion is another matter. Assurant and Roberts both recognize that Assurant's causation and redressability argument attacks facts Roberts alleges. *See* ECF Nos. 36-1 (arguing that because Assurant's 12(b)(1) motion is a factual attack the Court may consider two affidavits Assurant submitted); 48 at 2 (requesting jurisdictional discovery given Assurant's causation and redressability argument). So, the Court may consider extrinsic evidence in ruling on that aspect of Assurant's 12(b)(1) motion. *Carmichael*, 572 F.3d at 1279.

### B. Assurant's Causation and Redressability Argument

Unlike the other defendants, Assurant disclaims any relationship with Roberts, much less one sufficient to give Roberts standing to sue. *See* ECF No. 36 at 1 ("Assurant has no connection to the events and allegations of the Complaint."). Assurant states that it "is not an insurance company, does not issue insurance policies, and is not an insurer of plaintiff Lucy Roberts." *Id.* This lack of a relationship with Roberts or other connection to this case, Assurant argues, prevents Roberts from demonstrating that Assurant caused Roberts injury, and prevents any remedy the Court may grant from redressing that injury. ECF No. 36-1 at 5. Assurant believes Roberts therefore cannot show standing. And if Roberts lacks standing the Court would lack subject matter jurisdiction over Assurant. *Id.*

Roberts points to Assurant's filings with the Securities and Exchange Commission in arguing that, in fact, Assurant "is actively involved in the force-placed scheme." ECF No. 48 at 2. Roberts also appears to argue that because Assurant derives income from its ownership of ASIC the corporate veil between the two entities should be pierced to allow Roberts's unjust enrichment claim to proceed. *Id.* at 8-9. Alternatively, Roberts asks the Court to defer ruling on Assurant's 12(b)(1) motion and permit Roberts to

5

engage in limited jurisdictional discovery. *Id.* at 9-10.

The Court need not allow discovery or defer ruling because Roberts has not satisfied her burden of proving that she has standing to assert claims against Assurant. *See OSI, Inc.*, 285 F.3d at 951.

The power of federal courts is limited to "cases" and "controversies." U.S. CONST. art. III, § 2. Part of the case or controversy requirement is that a plaintiff have standing to sue. *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1264-65 (11th Cir. 2011).

Standing implicates "the power of the court to entertain the suit." *Id.* at 1265 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). As such, it must be established, by the plaintiff, before any consideration of a claim's merits. *See id.* ("The party invoking federal jurisdiction bears the burden of proving standing."); *TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accountants, P.C.*, 260 F. App'x 191, 195 (11th Cir. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 532 U.S. 83, 94 (1998)) (noting that subject matter jurisdiction is a threshold concern). A plaintiff, moreover, must establish standing as to each claim he or she asserts. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

The "irreducible constitutional minimum" of standing consists of (1) injury in fact; (2) "a causal connection between the injury and the conduct complained of[;]" and (3) a likelihood, not mere speculation, "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations omitted). Not surprisingly, causation and redressability "are often interconnected." *Kelly v. Harris*, 331 F.3d 817, 820 (11th Cir. 2003). "[I]f the injury is not caused by the challenged acts, an order directed to them will not redress it." *Id.*

Assurant has put forth evidence attacking the factual underpinnings of Roberts's standing to assert unjust enrichment and aiding and abetting claims against it. Jessica M. Olich ("Olich"), vice president and assistant secretary of Assurant, avers that Assurant is not an insurance company; is not an insurer of Roberts; does not contract with Wells Fargo or WFI; and does not provide commissions to either company. ECF No. 36-2 at 2-4. Olich also states that Assurant does not control the day to day operations of ASIC; rather, Assurant is the corporate parent of Interfinancial, Inc., who itself is the corporate parent of ASIC, both of whom maintain separate books and corporate records from ASIC. *Id.* at 3-4.

Assurant also cites the affidavit of Ronald K. Wilson ("Wilson"), the vice president of account management for Assurant Specialty Property. ECF No. 39-2. Wilson makes clear that Assurant Specialty Properties is merely a "trade name and service mark sometimes used by a group of companies, [including ASIC, but] *not* including Assurant . . . that provide lender-placed insurance." *Id.* at 3 (emphasis added). He also avers that Assurant is not a party to any agreements between ASIC and Wells Fargo. *Id.*

Unrebutted, such evidence demonstrates that Assurant could not have caused Roberts's alleged injuries. One simply

cannot cause a contract-based injury if one played no role whatsoever in the contract itself either as a party to the contract or an intended beneficiary. It would be as if a parent could be considered the cause of their child committing a crime by virtue of their role in the child's conception.

Roberts, of course, attempts to rebut the White and Olich affidavits. To do so, Roberts cites liberally to Assurant's Forms 10-K and 10-Q filed with the SEC in arguing that Assurant itself is directly involved in the conduct Roberts complains of.[5] *See* ECF No. 48 at 6-7.

Roberts concludes that Assurant is actively involved in the force-placed insurance scheme of ASIC and Wells Fargo based on statements such as: "[*W*]*e* use a proprietary insurance-tracking administration system . . . ." and "The majority of *our* lender-placed agreements are exclusive." *Id.* at 6 (quoting ECF No 48-1, Assurant's 2011 Form 10-K) (emphasis in original). Such statements, however, are mere "snippets" and do not paint a full picture of the relationship between Assurant, Assurant Specialty Property, and ASIC. ECF No. 56 at 6.

A complete reading of Assurant's SEC filings demonstrates that Assurant "is a holding company and, as such, has limited direct operations of its own. "[Its] assets consist primarily of the capital stock of [its] subsidiaries." ECF No. 56 at 9 (citing ECF No. 48-1). Assurant is organized into four operating segments, each of which is comprised of many different individual corporations, one of which is ASIC. *See* ECF No. 48-1 at 11. Assurant Specialty Property—itself a mere trade name—is one of those segments. *Id.* at 13. And ASIC is an indirect insurance company subsidiary within that segment. ECF No. 56 at 10. Assurant is not Assurant Specialty Property, and Assurant Specialty Property is not a company at all.

While Assurant's use of the personal pronouns "we" and "our" in their annual report and Form 10-K superficially seems to indicate the company's involvement in lender-placed insurance, that description alone is not dispositive. *See, e.g., Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) ("[R]eferences in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship."); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (finding parent company's statements in its annual report referring to "our" and "the company as a whole" not to show pervasive control by parent over subsidiary sufficient to pierce the corporate veil).

Assurant's wholly owned subsidiaries—most importantly ASIC—do sell the insurance products that Roberts challenges in this suit. *See* ECF No. 48-1 at 13. But Assurant itself does not. It is a mere holding company, a corporation designed only to own other corporations and profit from that ownership. *See, e.g.,* BLACK'S LAW

---

[5] Assurant may very well be correct that the Court should not take judicial notice of the SEC filings to prove the truth of their contents. *See* ECF No. 56 at 6 n.6. But, as Assurant notes, the SEC filings do not rebut Assurant's arguments or the Olich and Wilson affidavits. *Id.* at 6. The Court has considered the SEC filings cited, but only to highlight the depth of Roberts's failure to carry her burden to show jurisdiction.

7

DICTIONARY 319 (9th ed. 2011) (defining holding company as one "formed to control other companies, usually confining its role to owning stock and supervising management."). Isolated references to "we" and "ours" in public disclosures simply do not rebut that. In fact, a full read through of those same disclosures demonstrates that Assurant used the personal pronouns for ease of description, not to convey that Assurant itself did anything but own the corporations comprising its operating segments. *See* ECF No. 56 at 9.

Roberts alternatively argues that, at a minimum, her unjust enrichment claim should survive "[e]ven if this Court finds that Assurant's self-serving affidavits establish that Assurant is not involved in the force-placed scheme" because "Assurant profits from th[at] ... scheme." ECF No. 48 at 8. This argument also fails.

Unless a reason to pierce the corporate veil exists, a "parent corporation . . . is not liable for the acts of its subsidiaries," much less an indirect subsidiary like ASIC. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Two main theories justify piercing the veil: (1) where a subsidiary acts as the corporate parent's alter ego; and (2) where a wholly owned subsidiary becomes, in essence, the agent of the parent. *See Kissun v. Humana, Inc.*, 267 Ga. 419, 421 (1997).[6] But, "[a] parent/subsidiary relationship does not in and of itself establish the subsidiary as either the alter ego of the parent or as the parent's actual or apparent agent." *Matson v. Noble Inv. Grp.*, 288 Ga. App. 650, 659 (2007).

Roberts's complaint contains no allegations the veil between Assurant and ASIC—much less the veil between Interfinancial and Assurant—should be pierced, under either the alter ego or agency theory. *See* ECF No. 1. Even if that alone did not fatally undermine Roberts's veil piercing assertion, Assurant's relationship with ASIC does not justify holding Assurant liable for ASIC's actions.

As the corporate parent, Assurant undoubtedly profits from its ownership of ASIC (assuming, of course, ASIC itself turned a profit). But unlike the defendants in *Williams v. Wells Fargo Bank, N.A.*, who received, albeit through subsidiaries, a portion of the force-placed premium plaintiff paid, Assurant never received any money Roberts paid to Wells Fargo. No. 11-21233-CIV, 2011 WL 4368980, at *9 (S.D. Fla. Sept. 19, 2011). Assurant, like a stockholder paid a dividend by virtue of his or her ownership of the stock, profited from its ownership of ASIC, not from payment of premiums by borrowers with force-placed insurance. *See* ECF No. 56 at 11. Borrowers like Roberts paid premiums to ASIC, who allegedly then paid "kickbacks" to Wells Fargo and WFI. But no evidence Roberts presents supports the conclusion that Assurant received payments linked to the force-placed insurance Roberts objects to. Absent more than profit derived from ownership, Roberts cannot justify piercing the veil between Assurant and ASIC.

To be sure, Assurant likely also exercises the measure of control commensurate with

---

[6] As a federal court sitting in diversity jurisdiction, this Court must apply the substantive law of the forum state, in this case Georgia. *Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011).

that of a majority shareholder. But such control, even when coupled with dividend payments, cannot demonstrate the "total domination" necessary to support liability under the alter ego theory. *See Kissun*, 267 Ga. at 421. Nor does that level of control support a finding that ASIC acted as agent for Assurant. *See Phoenix Can. Oil Co. v. Texaco, Ltd.*, 842 F.2d 1466, 1477 (3d Cir. 1988) (noting that for agency liability to attach one corporation must act on behalf of the other, not merely involve itself in managerial decisions). All Roberts has shown is that Assurant is the corporate parent of ASIC. That alone is insufficient to pierce the corporate veil.

Roberts has not demonstrated that Assurant played any role in the force-placed insurance scheme she alleges is at the heart of her injury. She has not shown how any relief this Court could grant as to Assurant would redress the injuries she allegedly suffered. And, she has not shown any reason for this Court to pierce Assurant's corporate veil as to Roberts's unjust enrichment claim. Without standing, this Court cannot constitutionally adjudicate Roberts's claims against Assurant. Assurant's 12(b)(1) motion is therefore ***GRANTED*** and Roberts's claims against Assurant are ***DISMISSED***.

### C. The Filed Rate Doctrine

All remaining Defendants—Wells Fargo, WFI, and ASIC—believe Roberts's claims must be dismissed because application of the filed rate doctrine precludes her from suffering an injury sufficient for standing by paying the force-placed insurance premiums. *See* ECF Nos. 35; 39. Wells Fargo and WFI also assert the doctrine prevents Roberts from stating a claim. ECF No. 34.

Defendants' filed rate defense is best addressed in a 12(b)(6) motion. Although affirmative defenses like the filed rate doctrine typically "will not support a motion to dismiss. . . . a complaint may be dismissed under Rule 12(b)(6) . . . so long as the defense appears on the face of the complaint." *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). The filed rate defense here derives from Roberts's allegations and so is cognizable in a 12(b)(6) motion.

Defendants' 12(b)(1) motions, by contrast, paint a novel picture of the intersection between the injury requirement of standing, the filed rate doctrine, and subject matter jurisdiction. Given a choice between the well-charted path of dismissal for failure to state a claim and weighing in on unanswered standing and jurisdictional questions,[7] the Court finds it prudent to address the filed rate doctrine in the context of a 12(b)(6) motion.

First, the Court will discuss the filed rate doctrine's origins and purposes. Second, the Court will review the contexts—in terms of state or federal law claims, and state or federal rate setting agencies—in which both federal and Georgia courts have applied the

---

[7] The Eleventh Circuit, in *Taffet v. Southern Co.*, did state that paying filed rates precludes finding a legally cognizable injury. 967 F.2d 1483, 1494 (11th Cir. 1992). That court, however, then went on to state that the appellants therefore "have failed to state a claim upon which relief can be granted." *Id.* Such ambiguity, although perhaps supportive of Defendants' standing argument, does not persuade this Court to consider this issue in the context of a 12(b)(1) motion.

9

doctrine. And third, the Court will explain why, given the present context, certifying to the Supreme Court of Georgia the question of the filed rate doctrine's application in this case is the appropriate next step.

### A. Origins and Purposes

The Supreme Court first set forth the filed rate doctrine in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922). The plaintiff in *Keogh* alleged that a railroad company conspired to fix freight rates, in violation of antitrust laws. *See Wegoland, Ltd. v. NYNEX Corp.*, 806 F. Supp. 1112, 1113 (S.D.N.Y. 1992), *aff'd* 27 F.3d 17 (2d Cir. 1994). "The plaintiff [further] alleged that because he was forced to pay higher rates than he would have absent the conspiracy, he suffered damages to the extent of that difference in rates." *Id.* The Supreme Court held that where a plaintiff challenges a rate filed with and deemed reasonable by the Interstate Commerce Commission ("ICC"), the district court should "dismiss for failure to state a claim upon which relief can be granted. *Id.* at 1113-14; *see Keogh*, 260 U.S. at 161-62.

The Court pointed to several policy rationales, also relevant in this case, that justified the holding in *Keogh*. First, the Court stated that paying the rate filed with the ICC could not violate the plaintiff's legal rights "in respect to a rate" because the rate itself determined the extent of his rights and could not be "varied or enlarged by either contract or tort of the [railroad]." *Keogh*, 260 U.S. at 163. Second, the Court described what has come to be known as the nondiscrimination rationale. If courts could change rates retroactively, different consumers would pay different rates despite being members of the same class of ratepayers (i.e., the prevailing plaintiff would pay lower rates than other consumers). *See id.* And third, the Court noted that "the damages alleged are purely speculative." *Id.* at 164.

The Supreme Court, in the decades after *Keogh*, identified additional reasons for the doctrine. In *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951), the plaintiff claimed the defendant's fraud resulted in it paying unreasonably high utility rates. The Court once again refused to grant relief, this time because adjudicating what constituted a reasonable rate was "the function of the [ICC]." *Id.* at 251. As the Court saw it, the statutorily mandated reasonableness of a rate an agency is given power to set is not a "justiciable legal right," but rather a "criterion for administrative application in determining a lawful rate." *Id.*

Thirty years after *Montana-Dakota*, in *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981), the Court identified a slightly different rationale. This time, the Court's justifications for the filed rate doctrine were "preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant. *Id.* at 577-78.

So, the filed rate doctrine can be seen as furthering two main goals: (1) respecting statutory grants of rate-setting authority to agencies (the "nonjusticiability rationale"), *see Arkansas Louisiana Gas*, 453 U.S. at

577; (2) preventing discrimination between similarly situated rate-payers (the "nondiscrimination rationale"). *See Keogh*, 260 U.S. at 163.

The Eleventh Circuit also has applied the filed rate doctrine for these same reasons. *Taffet v. Southern Co.* recognized, in keeping with *Keogh* and *Montana-Dakota*, "that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." 967 F.2d 1483, 1490 (11th Cir. 1992). The court in *Taffet* refused to allow the plaintiff to recover on her RICO claims because to do so "would be unnecessarily disruptive to the state's scheme of utility regulation." *Id.* at 1494.[8]

And in *Hill v. Bellsouth Telecommunications, Inc.*, the court saw both the nondiscrimination and the nonjusticiability rationales as counseling dismissal of the plaintiff's claims. 364 F.3d 1308, 1316-17 (11th Cir. 2004). In fact, the court highlighted that "even if a claim does not directly attack the filed rate," if an award of damages "would, in effect, result in a judicial determination of the reasonableness of that rate," the filed rate doctrine prohibits adjudicating the claim. *Id.* at 1317.

---

[8] Georgia too has recognized the filed rate doctrine in the utility rate setting context. S*ee Carr v. S. Co.*, 263 Ga. 771, 771 (1994) (applying *Taffet*'s nonjusticiability rationale to dismiss a complaint seeking to "recover sums paid for utility services under rates set by" the state agency regulating utilities); *see also Ga. Power Co. v. Allied Chem. Corp.*, 233 Ga. 558, 560-61 (1975) (dismissing utility customer's claims to lower rates for lack of standing because customer's "remedy against the general application of allegedly unreasonably high rates lies at the ballot box.").

## B. Decisional Contexts—Causes of Action and Agencies

For much of its life, the filed rate doctrine lived and evolved in the context of federal claims involving rates set or approved by federal regulatory bodies. *See, e.g., Keogh*, 260 U.S. at 156 (dismissing antitrust claims that challenged a rate set by the ICC); *Montana-Dakota*, 341 U.S. at 250-51 (bringing cause of action under Federal Power Act to challenge utility rates set by the Federal Power Commission); *Wegoland*, 806 F. Supp. at 1125 (dismissing federal RICO claims that sought reset of interstate utility rates).

Over time, however, the doctrine expanded to include dismissal of complaints bringing federal claims challenging rates set by state agencies, *see, e.g., Taffet*, 967 F.2d at 1494 (dismissing RICO claims challenging rates set by Alabama and Georgia utility commissions); and complaints where federally approved rates formed the basis for the assertion of state law causes of action. *See Hill*, 364 F.3d at 1317 (dismissing two state law claims challenging rates filed with the Federal Communications Commission); *Wegoland*, 806 F. Supp. at 1125 (dismissing state law claims challenging interstate, and intrastate, utility rates); *Commc'ns Network Servs., Inc. v. MCI Worldcom Commc'ns, Inc.*, 258 Ga. App. 208 (2002) (dismissing breach of contract claims premised on rates approved by the FCC).

A fourth combination of causes of action and regulatory bodies exists: state law claims challenging rates filed with a state agency. Such a context presents issues grounded

solely in state law. This case presents that context.

Roberts only asserts state law claims and those claims challenge rates filed with a state official, the Commissioner. So, the only questions raised by this matter are ones of state law. But the filed rate doctrine typically applies in contexts presenting either a federal cause of action, a federally approved rate, or both. *See Hill*, 364 F.3d at 1317 (state law cause of action, federally approved rate); *Taffet*, 967 F.2d at 1494 (federal cause of action, state approved rate); *Keogh*, 260 U.S. at 156 (federally approved rate and federal cause of action).

Neither a state cause of action nor a state approved rate *individually* presents an obstacle to application of the filed rate doctrine. In fact, "the filed rate doctrine applies whether the rate in question is approved by a federal or state agency" because "[w]here the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate.'" *Taffet*, 967 F.2d at 1494 (quoting *Montana-Dakota*, 341 U.S. at 251). The state law origins of state causes of action also do not, by themselves, give cause to bar the doctrine's application. *See Hill*, 364 F.3d at 1317.

When state law claims and a state approved rate are found side by side in a case, however, they must give pause to federal courts considering application of the filed rate doctrine. *See generally Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011) (noting that federal courts sitting in diversity must apply the substantive law of the forum state). Should the filed rate doctrine not find expression in the laws of the forum state, its application by a federal court would presume powers reserved to the states long ago in *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938). With that in mind, the Court now turns to why the filed rate doctrine's applicability in this case is a matter best resolved by the Supreme Court of Georgia.

### C. Application of the Filed Rate Doctrine and the Certified Question

Georgia courts have long applied the filed rate doctrine in certain contexts. In *Communication Network Services*, for example, the court, deferring to the "comprehensive federal regulatory scheme set forth in the Federal Communications Act," found that the filed rate doctrine preempted state law counterclaims that sought a lower telephone service rate as relief. 258 Ga. App. at 209-10. So too in *Belk-Mathews Company v. Great Southern Trucking Company*, 218 Ga. 610 (1963). There, the court found the reasonableness of freight charges already passed upon by the ICC a non-justiciable issue. *Id.* at 611.

Importantly, in *Carr*, the Georgia Supreme Court applied the filed rate doctrine to bar state law claims challenging state approved rates. 263 Ga. at 771. The court dismissed the plaintiff's fraudulent misrepresentation claims as nonjusticiable because the utility rate setting scheme created by the Georgia legislature gave a state agency "exclusive power to determine what are just and reasonable [utility] rates."

*Id.* (quoting O.C.G.A. § 46-2-23(a)). The court, therefore, could not adjudicate "a ratepayer's cause of action to recover damages measured by the difference between the filed rate and the rate that would have been charged absent some alleged wrongdoing." *Id.*

In none of these Georgia decisions, however, did a court apply the filed rate doctrine to rates filed with the Commissioner. In determining whether the filed rate doctrine applies in this case, the question is two-fold: (1) whether Roberts in fact challenges insurance rates; and, if she does, (2) whether the insurance rate setting scheme in Georgia implicates the nonjusticiability rationale that underlies Georgia's application of the filed rate doctrine. *See, e.g., Carr,* 263 Ga. at 771.

### 1. Roberts's Claims

According to Roberts, her claims do "not challenge the rates filed by the Assurant Defendants [and charged by Wells Fargo and WFI]." ECF No. 46 at 2. "Instead, [Roberts] challenges the manner in which her bank, Wells Fargo, selected its insurers, and the impermissible kickbacks that were included in the premiums that were added to the balance of her mortgage loan." *Id.*

Roberts primarily relies on two cases from the Southern District of Florida—*Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81373, 2012 WL 2003337 (S.D. Fla. June 4, 2012) and *Abels v. JPMorgan Chase Bank, N.A,* 678 F. Supp. 2d 1273 (S.D. Fla. 2012)—to show that "[c]ourts in the Eleventh Circuit hold that the filed rate doctrine does not apply in these circumstances." ECF No. 46 at 2. Neither case is binding precedent or persuasive.

In *Kunzelmann*, the plaintiffs, like Roberts, challenged the force-placed insurance practices of Wells Fargo. 2012 WL 2003337, at *1. Wells Fargo asserted the same filed rate doctrine defense it does in this case. *Id.* at *2. And the plaintiff, once again like Roberts, asserted that they did not "challenge the actual insurance rates filed with the various state agencies." *Id.* at *1. Instead, the plaintiffs purported to "challenge[] the uncompetitive and unfair method that Wells Fargo used to select its insurer." *Id.* The court in *Kunzelman* accepted that argument without much elaboration. *Id.* at 3 (finding that plaintiffs challenged the manner of selecting insurers, the manipulation of the force-placed insurance process, and the impermissible kickbacks included in the premiums, not the rates themselves).

The court in *Abel*, in confronting a substantively similar case to *Kunzelmann* and this action, also accepted that the plaintiffs complained about the method of choosing an insurer, not the rate itself. *See Abel,* 678 F. Supp. 2d at 1277. As additional justification, the court stated that because Wells Fargo, as a bank, "is not subject to the extensive administrative oversight that insurance companies are," the filed rate doctrine does not apply. *Id.*

Even accepting the dubious notion that Roberts (and thus the plaintiffs from *Abel* and *Kunzelmann*) challenges the method of choosing an insurer and not the rate itself,[9]

---

[9] The Court doubts this is a fully accurate characterization of Roberts's complaint. For one,

13

the filed rate doctrine still potentially applies. Whatever else might be said about Roberts's claims, the damages she seeks can only be measured by the difference between the premiums she paid and what the premiums would have been absent the allegedly illegal "commissions, kickbacks, and free services" they contained. ECF No. 1 at 2. To calculate that amount "would, in effect, result in a judicial determination of the reasonableness of" the premium Roberts paid.[10] *See Hill*, 364 F.3d at 1317. And if the legislature has vested in the Commissioner authority to make that determination, allowing Roberts's requested relief would disrespect that statutory grant of rate setting authority. *See Arkansas Louisiana Gas*, 453 U.S. at 577.

So, should the filed rate doctrine apply to rates filed with the Commissioner, Roberts's claims, whether they attack the premium rate directly or not, would be subject to the doctrine's limitations. Whether the doctrine applies to Commissioner approved rates, however, is precisely the rub.

### 2. *Georgia's Framework For Insurance Regulation*

---

Roberts repeatedly decries the "excessively high," and "exorbitant and illegal" premiums paid to Wells Fargo. *See, e.g.*, ECF No. 1 at 1, 14. Regardless of the spin put on Roberts's allegations and claims, at bottom this case calls for relief that itself triggers application of the filed rate doctrine.

[10] An injunction prohibiting Wells Fargo from charging the full amount of the premium would likewise run into the same problem, assuming the filed rate doctrine applies to rates filed with the Commissioner. It would require the Court to confront the reasonableness of the rate, something the filed rate doctrine's nonjusticiability rationale expressly prohibits.

Georgia has extensive laws regulating its insurance industry, including the regulation of insurance rates. *See* O.C.G.A. §§ 33-9-1 to -44. The state requires every insurer to "maintain with the Commissioner copies of the rates ... used by it." *Id.* at § 21(a). And the state allows "[a]ny person aggrieved by any rate charged," who is then "aggrieved by the action of an insurer" in refusing to review the rate, to "file a written complaint and request for a hearing with the Commissioner." *Id.* at § 26.

Georgia does not, however, provide the Commissioner "exclusive power to determine what are just and reasonable rates," as it does the Public Service Commission ("PSC") in the utility rate arena. O.C.G.A. § 46-2-23(a). In fact, Georgia regulates its utility and insurance industries in substantially different ways.

The PSC, for example, not only has a clear grant of authority to set utility rates—it also has "full power and authority to make rules and regulations to effectuate . . . all laws conferring powers and duties upon the commission." *Id.* at § 30. By comparison, the Commissioner's rule making authority is circumscribed to five specific areas and is subject to approval by the state attorney general. O.C.G.A. § 33-2-9(a), (b).

Perhaps the power to require insurers to file their rates with the Commissioner is sufficiently analogous to the PSC's authority to determine what a reasonable utility rate is. If so, then the nonjusticiability rationale underlying the filed rate doctrine would likely dictate the doctrine's application in this case. But Georgia courts have never said that when an insurance rate is filed with

14

the Commissioner such a filing "is legislative in character" and therefore entitled to the deference accorded by the filed rate doctrine. *Carr*, 263 Ga. at 771.

## IV. CONCLUSION

"The Court finds that no clear, controlling precedent from Georgia courts addresses" whether the filed rate doctrine applies to force-placed insurance rates filed with the Commissioner. *State Auto Prop. & Cas. Co. v. Matty*, No. 4:08-cv-98, 2009 WL 2216605, at *5 (M.D. Ga. July 20, 2009). "Because the resolution of this issue of first impression under Georgia law is determinative of the outcome in this case, the Court certifies the following question the Supreme Court of Georgia[:]"[11]

> WHETHER THE FILED RATE DOCTRINE APPLIES TO BAR CLAIMS WHOSE REQUESTED RELIEF NECESSARILY CHALLENGES RATES FILED WITH THE GEORGIA INSURANCE COMMISSIONER.

Neither the phrasing of this question, nor this Court's analysis is intended to limit the Supreme Court of Georgia's consideration of the case. To assists in consideration of this question, the Clerk is **ORDERED** to transmit the following documents, along with any attachments, to the Supreme Court of Georgia: ECF Nos. 1; 34-37; 39; 46-50; 55-57; 59. This case is **STAYED** pending the Supreme Court of Georgia's decision on the certified question.

In addition to certifying a question, the Court also **GRANTS** Assurant's motion to dismiss for lack of subject matter jurisdiction. Roberts's unjust enrichment and aiding and abetting claims against Assurant therefore are **DISMISSED**.

This 27 day of March 2013.

*[signature]*

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[11] *Id.*; *see also* GA. SUP. CT. R. 46.